1

2

3

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

4

5

6

7

8

9

JOSEPH ANTONETTI,

                    Plaintiff,

    v.

FILSON, *et al.,*

                    Defendants.

Case No. 3:17-cv-00605-MMD-CLB

## REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE[1]

10

11

12

13

14

15

16

17

18

19

20

21

      This case involves a civil rights action filed by Plaintiff Joseph Antonetti, ("Antonetti"), against Defendants Romeo Aranas ("Aranas"), Renee Baker ("Baker"), Harold Byrne ("Byrne"), Ronald Bryant ("Bryant"), Gloria Carpenter ("Carpenter"), Jesse Cox ("Cox"), Dwayne Deal ("Deal"), James Dzurenda ("Dzurenda"), William Gittere ("Gittere"), Sheryl Foster ("Foster"), Richard Healer ("Healer"), Paul Hunt ("Hunt"), Tasheena Sandoval ("Sandoval"), Scott Sisco ("Sisco"), David Tristan ("Tristan"), Harold Wickham ("Wickham"), and John Does one (1) through fifteen (15) (collectively referred to as "Defendants"). Currently pending before the court is Defendants' motion for summary judgment. (ECF Nos. 49, 51[2]). Antonetti responded (ECF No. 63), and Defendants replied (ECF No. 71). Having thoroughly reviewed the record and papers, the court recommends Defendants' motion for summary judgment (ECF No. 49) be granted.

22

23

24

25

26

---

[1]    This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.

27

28

[2]    ECF No. 51 consists of sealed exhibits filed by Defendants' in support of the motion for summary judgment. Defendants also filed two erratas to their motion for summary judgment at ECF Nos. 54 and 70, and an errata to their reply brief at ECF No. 72. Antonetti, likewise, filed an errata to his opposition at ECF No. 76.

## I.    BACKGROUND AND PROCEDURAL HISTORY

Antonetti is an inmate currently in custody at the Lea County Corrections Facility in Hobbs, New Mexico.  (*See* ECF No. 44, Antonetti's Change of Address).  The events at issue in this case occurred while Antonetti was in the custody of the Nevada Department of Corrections ("NDOC"), housed at the Ely State Prison ("ESP").  (*See* ECF No. 6 at 1).  On October 2, 2017, proceeding *pro se*, Antonetti submitted a civil rights complaint pursuant to 42 U.S.C. § 1983, which he signed and verified, under penalty of perjury, acknowledging the facts and information contained in the complaint were "true and correct."  (ECF No. 6 at 15).  Pursuant to 28 U.S.C. § 1915A(a), the court screened the complaint on October 3, 2018, and issued a screening order. (ECF No. 5.)

The court allowed Antonetti to proceed on portions of the following claims: 1) Count II, an Eighth Amendment claim based on deliberate indifference to serious medical needs regarding diet accommodations against Aranas, Baker, Byrne, Deal, Dzurenda, Foster, Gittere, Sandoval, Sisco, Tristan, and Wickham; 2) Count IV, to the extent this claim alleged an Eighth Amendment deliberate indifference to serious medical needs claim regarding pain medication against Aranas, Byrne, Carpenter, Deal, Dzurenda, Foster, Gittere, Sandoval, Sisco, Tristan, and Wickham; 3) Count IV, the portion alleging an Eighth Amendment deliberate indifference to serious medical needs claim regarding big boy cuffs[3] against Aranas, Byrne, Carpenter, Deal, Dzurenda, Foster, Gittere, Sandoval, Sisco, Tristan, and Wickham; 4) Count VI, the portion alleging First Amendment claims based upon Antonetti's right to send mail and alleged retaliation against him by Bryant, Byrne, Cox, Deal, Dzurenda, Foster, Gittere, Healer, Hunt, Sandoval, Wickham, and Does one (1) through fifteen (15); and 5) Count VII, to the extent it alleged Fourteenth Amendment due process and First Amendment retaliation claims

---

[3]    "Big boy cuffs" are oversized ankle restraints allegedly "necessitated by large, heavy-set inmates whose ankles exceed the capacity of ordinary ankle cuffs."  (ECF No. 49 at 16).  *See* NDOC Administrative Regulation ("AR") 407.02(2)(B) ("In the case of an inmate with large legs that regular leg restraints will not work on, the Associate Warden or designee will approve the use of restraints designed for this type of application.")

1
2
against Baker, Byrne, Deal, Dzurenda, Foster, Gittere, and Wickham.[4]  (ECF No. 5 at 35-36).

### A.    Counts II and IV – Antonetti's Deliberate Indifference Claims[5]

Counts II and IV of Antonetti's complaint allege the following:

#### 1.    Count II – Antonetti's Medical Diet

Antonetti claims he was prescribed a special medical diet because of a physical condition which required him to consume extra calories.  (ECF No. 6 at 13).  To avoid hospitalization, Antonetti discontinued his religious diet to begin the special medical diet.  (*Id.*)  Concurrently with the special diet, Antonetti was taking "Remeron," a mental health medication that increased his hunger.  (*Id.* at 15).  As a result of the combination of those medical conditions, Antonetti weighed roughly fifty (50) pounds less than his comfortable weight of 175 pounds.  (*Id.* at 13).  Antonetti's Body Mass Index (BMI) indicated he should be between 140-170 pounds to be considered "healthy," but Antonetti instead weighed only 126-136 pounds.  (*Id.*)

Despite him being underweight, at the end of 2016 prison officials cancelled Antonetti's special medical diet without an exam or follow-up.  (*Id.*)  After Antonetti complained he was malnourished, "Dr. Martin and others" re-ordered Antonetti's special medical diet "several times."  (*Id.*)  However, the diet was not provided and Antonetti was informed that medical directors and prison officials refused to follow the doctors' orders.  (*Id.* at 13-14).  Antonetti claims he suffers from shaking, twitching, low energy, poor

---

[4]    Antonetti also named the Nevada Board of Prison Commissioners in his complaint, which was dismissed with prejudice.  (ECF No. 6 at 8; ECF No. 5 at 3, n.1).  Further, the court dismissed portions of Counts I, II, III, V, VI, and VII both with and without prejudice, with leave to amend.  (ECF No. 5 at 34-37).  The court further dismissed Antonetti's state law claims, without prejudice, without leave to amend.  (ECF No. 5 at 37).  Accordingly, Antonetti proceeds only on portions of Counts II, IV, VI, and VII as stated herein.  (*See* ECF No. 5.)  Although Antonetti was permitted to proceed on claims against the unidentified John Does one (1) through fifteen (15), he has failed to identify the Doe Defendants and thus appears to have abandoned those claims.  (*See* ECF No. 34, setting the discovery deadline as December 9, 2019).  Thus, the court recommends the claims against the Doe Defendants be dismissed from this action.

[5]    The facts as stated herein are taken from the allegations asserted in the Complaint unless noted otherwise.

concentration, lack of sleep, stomach cramps, headaches, weakness that causes falls and injuries, and feeling constantly cold.  (*Id.* at 14).

Antonetti alleges he made Aranas, Baker, Byrne, Deal, Dzurenda, Foster, Gittere, Sandoval, Sisco, Tristan, and Wickham aware of his serious medical need for a special diet, but that Defendants either failed to provide the diet or failed to properly train and supervise staff.  (*Id.*)  Antonetti further alleges a custom, policy, and practice of manipulating responses to thwart legal action rather than solve problems.  (*Id.* at 14-15).  Antonetti claims that, in their grievance responses, officials improperly rely on legal terminology to justify deprivations of inmate rights.  (*Id.* at 15).

### 2.    Count IV – Antonetti's Pain Medication and Restraints

Antonetti alleges he was experimented on through a "trial and error" process that included NDOC officials using psychological medications to treat pain symptoms and using medications "theoretically."  (*Id.* at 18-20).  Such experiments were conducted on, at minimum, Antonetti's arm, back, foot, knee, leg, and shoulder.  (*Id.* at 18).  Further, Antonetti alleges he has significant nerve damage in his knee and ankle.  (*Id.*)  He has a disabling knee injury and his ankles suffered damage "due to years of shackles gauging the skin out of his ankles."  (*Id.*)  Consequently, Antonetti suffers numbness and burning sensations and spontaneous loss of function in his limbs, sometimes causing him to fall down without warning.  (*Id.*)  At the end of the trial and error process, Antonetti claims he received prescription medications that provided him with some relief, but those medications were discontinued without explanation, notice, a follow-up exam, or alternative medications.  (*Id.* at 18-19).

Antonetti claims he was then given medications providers knew did not work and made him sick.  (*Id.* at 19).  NDOC gave Antonetti the "run around" while treating him by providing him ineffective medication that made him vomit, sweat, lose sleep, and experience headaches and depression.  (*Id.*)  NDOC further declined to provide him with medications that worked, entirely failing to review prior recommendations and prescriptions.  (*Id.*)  Antonetti alleges Defendants Aranas, Byrne, Carpenter, Deal,

4

1   Dzurenda, Foster, Gittere, Sandoval, Sisco, Tristan, and Wickham should have given him
2   medication that had worked for Antonetti in the past and that they should have reviewed
3   previous doctor's orders to determine what medications had been tried on Antonetti in the
4   past but failed to work for him. (*Id.* at 19-20). Antonetti alleges the named officials,
5   through policy, practice, and custom, set up a screen of personnel to protect them from
6   litigation and that they intentionally avoid being made aware of abuses of inmates' rights.
7   (*Id.* at 20).

8                    **3.    Antonetti's Restraints**

9        Antonetti claims big boy cuffs are "commonly given to avoid ankle injury" or to
10  avoid exacerbating other pre-existing injuries because they aid in walking. (*Id.* at 21).
11  Antonetti alleges he should have been given big boy cuffs because the cuts in his ankles
12  have led to nerve damage and because his kneecap was broken. (*Id.*) Antonetti asserts
13  Defendants Aranas, Byrne, Carpenter, Deal, Dzurenda, Foster, Gittere, Sandoval, Sisco,
14  Tristan, and Wickham were deliberately indifferent to Antonetti's serious medical needs
15  by failing to provide him with big boy ankle cuffs when transporting him. (*Id.*)

16          **B.    Count VI – Antonetti's Access to Mail and Retaliation Claims**

17       Count VI of Antonetti's complaint alleges that at various times, Defendants Bryant,
18  Byrne, Cox, Deal, Dzurenda, Foster, Gittere, Healer, Hunt, Sandoval, Wickham, and
19  Does one (1) through fifteen (15) refused to send out Antonetti's legal mail. (*Id.* at 23).
20  Antonetti alleges Defendants' failures were the result of a custom, policy, and practice at
21  NDOC to conspire to frustrate, impede, and deny Antonetti's right to litigation and legal
22  mail. (*Id.*) Antonetti further alleges a failure to supervise, asserting that he informed
23  prison officials he was having problems obtaining his legal mail because correctional
24  officers refused to take legal mail to the mail room and rejected brass slips for postage.
25  (*Id.* at 24). Antonetti further alleges Defendants' actions were taken in retaliation against
26  him because he is a known litigator attempting to sue NDOC and particular NDOC officials
27  in state and federal court. (*Id.* at 23-24). Antonetti alleges that the failure to supervise

28

1   operates as prison administrators' tacit authorization of correctional officer misconduct.
2   (*Id.* at 24).

3   **C.     Count VII – Antonetti's Due Process and Retaliation Claims**

4        Count VII of Antonetti's complaint alleges Defendants Baker, Byrne, Deal,
5   Dzurenda, Foster, Gittere, and Wickham retaliated against Antonetti by subjecting him to
6   indeterminate administrative segregation ("ad-seg").  (*Id.* at 25).  Antonetti alleges the
7   segregation was without notice, and that the classification was meaningless, biased, and
8   predetermined.    (*Id.*)    Antonetti alleges a policy, custom, and practice of NDOC
9   administrators' tacit authorization of ad-seg as retaliation for litigation.  (*Id.*)  Antonetti
10  further alleges he was disparately segregated because of his race and politics.  (*Id.*)

11       Antonetti alleges he suffered atrophy and muscle loss, exacerbated head, neck,
12  and knee injuries, and other physical degeneration because of the ad-seg.  (*Id.* at 26).
13  Antonetti further alleges he suffered because he was unable to interact with other inmates
14  or play sports because he was locked down in segregation 23 hours per day.  (*Id.*)
15  Antonetti further alleges he suffered from poor hygiene, and that the noise from
16  psychiatric patients exacerbated his own ADHD, impulsiveness, and depression because
17  of the improper solitary confinement.  (*Id.*)

18       **D.     Defendants' Motion for Summary Judgment**

19       On March 9, 2020, Defendants filed a motion for summary judgment (ECF Nos.
20  49, 51).  Defendants argue they are entitled to summary judgment because Defendants
21  were not deliberately indifferent to Antonetti and did not retaliate against him, and
22  alternatively, Defendants are entitled to qualified immunity.  (*Id.* at 8-27).  Antonetti
23  opposed the motion, (ECF Nos. 63, 76), and Defendants replied (ECF No. 71).  Further,
24  Antonetti filed a motion to strike portions of Defendants' reply arguing Defendants
25  mischaracterized some of his arguments and that some NDOC ARs are not current
26  because they have not been updated annually.  (*See* ECF NO. 75).  The recommended
27  disposition follows.

28

## II.    LEGAL STANDARD

Summary judgment should be granted when the record demonstrates that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "[T]he substantive law will identify which facts are material. A dispute is "genuine" only where a reasonable jury could find for the nonmoving party. *Id.* Conclusory statements, speculative opinions, pleading allegations, or other assertions uncorroborated by facts are insufficient to establish a genuine dispute. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996).

Summary judgment proceeds in burden-shifting steps. A moving party who does not bear the burden of proof at trial "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element" to support its case. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Ultimately, the moving party must demonstrate, on the basis of authenticated evidence, that the record forecloses the possibility of a reasonable jury finding in favor of the nonmoving party as to disputed material facts. *Celotex*, 477 U.S. at 323; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). The court views all evidence and any inferences arising therefrom in the light most favorable to the nonmoving party. *Colwell v. Bannister*, 763 F.3d 1060, 1065 (9th Cir. 2014).

Where the moving party meets its burden, the burden shifts to the nonmoving party to "designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citation omitted). "This burden is not a light one," and requires the nonmoving party to "show more than the mere existence of a scintilla of evidence. . . . In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.* (citations omitted). The nonmoving party may defeat the summary judgment motion only by setting forth specific facts that illustrate a genuine dispute

1    requiring a factfinder's resolution.  *Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324.

2    For purposes of opposing summary judgment, the contentions offered by a *pro se*

3    litigant in motions and pleadings are admissible to the extent that the contents are based

4    on personal knowledge and set forth facts that would be admissible into evidence and the

5    litigant attested under penalty of perjury that they were true and correct.  *Jones v. Blanas*,

6    393 F.3d 918, 923 (9th Cir. 2004).

7    **III.    DISCUSSION**

8    **A.    Civil Rights Claims under 42 U.S.C. § 1983**

9    42 U.S.C. § 1983 aims "to deter state actors from using the badge of their authority

10   to deprive individuals of their federally guaranteed rights." *Anderson v. Warner*, 451 F.3d

11   1063, 1067 (9th Cir. 2006) (quoting *McDade v. West*, 223 F.3d 1135 1139 (9th Cir. 2000)).

12   The statute "provides a federal cause of action against any person who, acting under color

13   of state law, deprives another of his federal rights[,]" *Conn v. Gabbert*, 526 U.S. 286, 290

14   (1999), and therefore "serves as the procedural device for enforcing substantive

15   provisions of the Constitution and federal statutes." *Crumpton v. Almy*, 947 F.2d 1418,

16   1420 (9th Cir. 1991).  Claims under section 1983 require a plaintiff to allege (1) the

17   violation of a federally-protected right by (2) a person or official acting under the color of

18   state law.  *Warner*, 451 F.3d at 1067.  Further, to prevail on a § 1983 claim, the plaintiff

19   must establish each of the elements required to prove an infringement of the underlying

20   constitutional or statutory right.

21   **B.    Counts II and IV – Antonetti's Deliberate Indifference Claims**

22   Counts II and IV allege Eighth Amendment claims for deliberate indifference to

23   medical needs based upon the change to Antonetti's diet, pain medications, and the use

24   of restraints.  (*See* ECF No. 6).  The Eighth Amendment "embodies broad and idealistic

25   concepts of dignity, civilized standards, humanity, and decency" by prohibiting the

26   imposition of cruel and unusual punishment by state actors.  *Estelle v. Gamble*, 429 U.S.

27   97, 102 (1976) (internal quotation omitted).  The Amendment's proscription against the

28   "unnecessary and wanton infliction of pain" encompasses deliberate indifference by state

officials to the medical needs of prisoners.  *Id.* at 104 (internal quotation omitted).  It is thus well established that "deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983."  *Id.* at 106.

Courts in this Circuit employ a two-part test when analyzing deliberate indifference claims.  The plaintiff must satisfy "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard— deliberate indifference."  *Colwell*, 763 F.3d at 1066 (internal quotation omitted).  First, the objective component examines whether the plaintiff has a "serious medical need," such that the state's failure to provide treatment could result in further injury or cause unnecessary and wanton infliction of pain.  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).  Serious medical needs include those "that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain."  *Colwell*, 763 F.3d at 1066 (internal quotation omitted).

Second, the subjective element considers the defendant's state of mind, the extent of care provided, and whether the plaintiff was harmed.  "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment."  *Hallett v. Morgan,* 296 F.3d 732, 744 (9th Cir. 2002) (internal quotation omitted).  However, a prison official may only be held liable if he or she "knows of and disregards an excessive risk to inmate health and safety."  *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004).  The defendant prison official must therefore have actual knowledge from which he or she can infer that a substantial risk of harm exists, and also make that inference.  *Colwell*, 763 F.3d at 1066.  An accidental or inadvertent failure to provide adequate care is not enough to impose liability.  *Estelle*, 429 U.S. at 105–06.  Rather, the standard lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other . . . ."  *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  Accordingly, the defendants' conduct must consist of "more than ordinary lack of due care."  *Id.* at 835 (internal quotation omitted) (*see Wood v.*

1   *Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) ("[M]ere malpractice, or even gross

2   negligence" in the provision of care fails to state a deliberate indifference claim).

3          A difference of opinion between a physician and a prisoner – or between medical

4   professionals – concerning what medical care is appropriate does not amount to

5   deliberate indifference.  *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (citing

6   *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1986).  Instead, the prisoner "must show

7   that the course of treatment the doctors chose was medically unacceptable under the

8   circumstances and that the defendants chose this course in conscious disregard of an

9   excessive risk to [his] health."  *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012)

10  (overruled, in part, on other grounds by *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014))

11  (quoting *Jackson*, 90 F.3d at 332).

12         Defendants argue they are entitled to summary judgment on each deliberate

13  indifference claim because the evidentiary record shows Defendants were not

14  deliberately indifferent to Antonetti in any way.  (ECF No. 49 at 8-17).[6]  In this instance,

15  Defendants do not contest that Antonetti's chronic malnourishment, nerve pain, and ankle

16  and knee injuries constitute serious medical needs for purposes of the Eighth Amendment

17  analysis.  *See Colwell*, 763 F.3d at 1066.  Thus, the only issue is whether Antonetti has

18  come forward with some evidence to establish a genuine issue of fact that Defendants

19  knew of and disregarded "an excessive risk to [Antonetti's] health and safety" based on

20  the change in his diet, the pain medication, or the use of restraints.  *Toguchi*, 391 F.3d at

21  1057.

22         Based on the evidence before the court, and in viewing all facts and drawing all

23

24  _____

25  [6]    Defendants also argue that summary judgment should be granted as to his pain
    medication claims because Antonetti failed to exhaust his administrative remedies.  (ECF
    No. 49 at 11-15).  While it is true Antonetti failed to exhaust his administrative remedies
26  regarding grievance ID Nos. 2006-30-48126 and 2006-30-50550 prior to filing his
    complaint, Antonetti did successfully exhaust his administrative remedies regarding
27  grievance ID No. 2006-30-35540.  (*See* ECF No. 49-2 at 4, 9, and 31, respectively).
    Therefore, the court finds that Antonetti did not fail to exhaust his administrative remedies
28  regarding his pain medication claims.

1  inferences in the light most favorable to Antonetti, the court finds summary judgment

2  should be granted in favor of Defendants on each of Antonetti's deliberate indifference

3  claims.  Defendants have, on the basis of authenticated evidence, shown that the record

4  forecloses the possibility of a reasonable jury finding in Antonetti's favor on any of these

5  claims.  *Celotex*, 477 U.S. at 323.

6  Accordingly, the burden shifts to Antonetti to "designate specific facts

7  demonstrating the existence of genuine issues for trial."  *In re Oracle Corp.*, 627 F.3d at

8  387.  Antonetti fails to meet his burden.  While Antonetti attached grievances, personal

9  certifications, and other various items to his opposition and to his errata to that opposition,

10  (*see* ECF Nos. 63, 76, respectively), none of these documents provides  any evidence

11  Defendants were deliberately indifferent to his serious medical needs.

### 1. Count II – Antonetti's Medical Diet

13  In Count II, Antonetti claims Defendants were deliberately indifferent to him by

14  failing to provide him with double meals, causing his BMI to reflect an unhealthy weight.

15  (ECF No. 6 at 13-15).  The facts are undisputed between the parties that on January 13,

16  2016, Defendant Carpenter signed off on a Medical Diet Order Form that ordered

17  Antonetti double meal portions for one year.  (ECF No. 51-1 at 2).  Moreover, it is further

18  undisputed that Antonetti's double meal orders expired on January 13, 2017.  (*See* ECF

19  No. 51-1 at 2).  Dr. Martin entered an order to extend Antonetti's double meals roughly

20  around May 2017.  (ECF No. 71-1 at 66).  However, after review, Defendant Aranas

21  denied the order and instead ordered a "Boost" brand dietary supplement for Antonetti.

22  (*Id.* at 65).[7]

23  Although Defendant Aranas canceled Dr. Martin's order to extend Antonetti's

24  double portions and ordered "Boost", Antonetti has provided no evidence that "Boost"

25  was a medically unacceptable replacement for double meal portions.  (*See* ECF No. 71-

26

27

28  [7]   "Boost" is a name-brand dietary supplement created by Nestlé Foods.  Each 8 fl. oz. serving contains 240 calories, 10 grams of protein, and 27 vitamins and minerals, including calcium and Vitamin D.

1 at 65; *see also Taplet v. Brooks*, 432 Fed. Appx. 697, 698 (9th Cir. 2011) (finding that Plaintiff's own allegations, unsupported by expert testimony, were insufficient to create a dispute of fact over whether care was medically acceptable) (citing *Clouthier v. Cnty. Of Contra Costa*, 591 F.3d 1232, 1252 (9th Cir. 2010) (overruled, in part, on other grounds by *Castro v. Cnty. Of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016)).

In opposition, Antonetti provides only his opinions that the care he received from Defendants was improper. However, a mere difference of opinion between a physician and a prisoner concerning what medical care is appropriate does not amount to deliberate indifference. *Wilhelm*, 680 F.3d at 1122. Consequently, Antonetti has provided no evidence that Defendants' care was medically unacceptable under the circumstances. Thus, Antonetti cannot establish a genuine dispute regarding whether Defendants' failure to provide double meal portions was deliberately indifferent. Therefore, summary judgment should be entered on this claim.

### 2.    Count IV – Antonetti's Pain Medication and Restraints

In Count IV, Antonetti alleges his medications were taken away and cancelled without explanation, notice, a follow up exam, or alternative medications, leaving him in severe pain. (ECF No. 6 at 18-20). It is undisputed that on October 13, 2016, Antonetti submitted a grievance (ID No. 2006-30-35540) requesting a reversal of medical charges and alleging that his medications were taken away and cancelled, leaving him in severe nerve pain. (ECF No. 71-1 at 7). Defendant Aranas denied the grievance, explaining that Antonetti was prescribed medication for his pain six months later, on April 13, 2017, that Antonetti failed to follow simple instructions to fill out the charge reversal forms, and that the reversal forms had not been received. (*Id.* at 4). Thus, the undisputed evidence shows that Antonetti requested pain medication on October 13, 2016 but did not receive a prescription for that medication until April 13, 2017, six months later. (ECF No. 71-7 at 4, 7).

A delay in the administration of pain medication is more akin to negligence than deliberate indifference. *See Frost v. Agnos*, 152 F.3d 1124, 1130 (9th Cir. 1998) (finding

that delays in administering pain medication, treating a broken nose, and providing a replacement crutch may have been negligent but did not rise to the level of deliberate indifference). Indeed, "mere malpractice, or even gross negligence does not suffice" to state a claim for deliberate indifference. *Wood*, 900 F.2d at 1334. Even where treatment is "not as prompt or efficient as a free citizen might hope to receive," the focus should be on whether Antonetti "was given medical care at the prison that addressed his needs." *Id.* Even a six-month delay in receipt of pain medications does not, by itself, establish deliberate indifference. *Id.* at 1334-35 (finding that a five-month delay in medical treatment was not deliberate indifference because the harm was not substantial). Rather, Antonetti must show that Defendants knew of and disregarded "an excessive risk to [Antonetti's] health and safety." *Toguchi*, 391 F.3d at 1057. Here, Antonetti has produced no evidence that establishes the requisite subjective prong of the deliberate indifference analysis, i.e., that the delay of Antonetti's medication was done with knowledge and in disregard of any excessive risk it may cause to Antonetti's health or safety. *See Colwell*, 763 F.3d at 1066. The undisputed evidence shows Antonetti was given pain medication to address his needs in April 2017.

Moreover, the undisputed evidence shows whatever harm Antonetti suffered because of any delay in pain medication was not substantial, which is required to establish this claim. *See id.*; *see also Wood*, 900 F.2d at 1334-35. In early February 2017, Antonetti was present at the front of his cell for an ad-seg review, during which he indicated that he understood the process to report incidents and that he did not wish to speak with mental health providers. (ECF No. 49-8 at 12). Later that month, Antonetti engaged in an inmate-on-inmate brawl while in possession of a prison shank. (*See* ECF No. 49-5). Thereafter, Antonetti was seen for ad-seg reviews twice more in February 2017 (ECF No. 49-8 at 13-14) and twice in March 2017 (*Id.* at 15-16). Further, the record shows Antonetti extensively discussed criminal charges related to the prison shank incident in February and March 2017, and that Antonetti further declined to be seen by staff in late March 2017. (*See* ECF Nos. 49-1 at 19 and 49-8 at 12-16). However, nothing

1   in the record shows Antonetti complained of severe or debilitating pain during these

2   multiple encounters, or that Antonetti submitted any pain-related medical kites or

3   additional pain-related grievances before his April 2017 receipt of pain medications.

4          Rather, on May 18, 2017, Antonetti submitted a grievance (ID No. 2006-30-48126)

5   claiming NDOC repeatedly canceled his medications and that NDOC medical directors

6   refused to give him pain medication for chronic back pain and nerve damage in his ankle.

7   (ECF No. 71-1 at 42).  NDOC responded that Antonetti himself requested to be taken off

8   Gabapentin, then requested to be taken off Cymbalta and that providers could not help

9   Antonetti if he continued to refuse the treatment they offered.  (*Id.* at 43).  Defendant

10  Aranas denied the grievance, pointing out that Antonetti submitted no medical kites that

11  year, that he was still taking Ibuprofen, Capsaicin ointment, and Tegretol and that he had

12  not submitted any kites complaining of pain after receiving the Tegretol.  (*Id.* at 39).  Thus,

13  the undisputed evidence shows Defendants were generally responsive to Antonetti's

14  complaints of pain when he made such complaints.  Antonetti has offered no evidence to

15  suggest Defendants knew he was in substantial pain during the six-month time period,

16  and thus has failed to show that Defendants knew of and disregarded "an excessive risk

17  to [Antonetti's] health and safety" by delaying his pain medication.  *Toguchi*, 391 F.3d at

18  1057.  Thus, Antonetti fails to establish a triable issue of fact on his pain medication claims.

19  Therefore, summary judgment should be entered as to this claim.

20                  **3.      Antonetti's Restraints**

21          In Count IV, Antonetti alleges big boy cuffs are commonly used to aid in walking

22  and to avoid ankle injury. Antonetti claims Defendants were deliberately indifferent to him

23  because they failed to allow him to walk in big boy cuffs when restrained in leg shackles,

24  exacerbating his prior ankle and knee injuries.  (ECF No. 6 at 21).  The evidence is

25  undisputed that in 2008, Antonetti suffered an ankle injury in a man down incident related

26  to "cuffs."  (ECF No. 51-8 at 2).  Nearly five years later, in 2013, Antonetti suffered a

27  kneecap injury.  (*Id.*)  Although Antonetti has demonstrated that he previously suffered

28  ankle and knee injuries, Antonetti has offered no evidence to show that big boy cuffs are

used to aid in walking or to avoid ankle injury.  Defendants provided a copy of NDOC Administrative Regulation ("AR") 407.02(2)(B), which states, "[i]n the case of an inmate with large legs that regular leg restraints will not work on, the Associate Warden or designee will approve the use of restraints designed for this type of application."  (ECF No. 71-4 at 4).  Thus, the undisputed evidence shows that big boy cuffs are used to restrain the ankles of oversized inmates.

Antonetti has offered no evidence that he should have been provided big boy cuffs to aid in walking or to avoid further ankle injury, or that a practice of providing big boy cuffs to non-oversized inmates to aid in walking or to avoid injury exists at NDOC facilities.  Further, Antonetti has an extensive escape attempt history and has been found in possession of prison escape tools on multiple occasions, indicating a need for effective restraints.  (*See* ECF No. 49-1).  Antonetti has provided no evidence that Defendants' failure to provide him with big boy cuffs meets the exacting subjective prong of the deliberate indifference analysis.  *See Toguchi*, 391 F.3d at 1057.

Antonetti has provided no evidence to show Defendants were deliberately indifferent to his serious medical needs and thus fails to demonstrate a genuine dispute of fact remains regarding any of his deliberate indifference claims.  Accordingly, the court recommends Defendants' motion for summary judgment (ECF No. 49) be granted in favor of Defendants on Counts II and IV, Antonetti's Eighth Amendment deliberate indifference to serious medical needs claims.

### C.    Counts VI and VII – Antonetti's Retaliation Claims

Next, Defendants seek summary judgment on Counts VI and VII, Antonetti's First Amendment and Fourteenth Amendment claims.  (ECF No. 49 at 17-27).  Prisoners have a general right to be free from retaliatory punishment.  *Shepard v. Quillen*, 840 F.3d 686, 693 (9th Cir. 2016) (citing *Rhodes v. Robinson*, 408 F.3d 559, 569 (9th Cir. 2005)).  "Prisoners have a First Amendment right to file grievances against prison officials and be free from retaliation for doing so."  *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012).  Indeed, the Ninth Circuit has stated "the mere *threat* of harm" may be enough to amount

1  to a violation, "regardless of whether it is carried out because the threat itself can have a

2  chilling effect."  *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009) (emphasis in

3  original).  "'[A] threat of retaliation is sufficient injury if made in retaliation for an inmate's

4  use of prison grievance procedures.'"  *Id.* (citation omitted).

5       "A prison inmate retains those First Amendment rights that are not inconsistent

6  with his status as a prisoner or with the legitimate penological objectives of the corrections

7  system."  *Pell v. Procunier*, 417 U.S. 817, 822 (1974).  "Within the prison context, a viable

8  claim of First Amendment retaliation entails five basic elements: (1) An assertion that a

9  state actor took some adverse action against an inmate (2) because of (3) that prisoner's

10  protected conduct, and that such action (4) chilled the inmate's exercise of his First

11  Amendment rights, and (5) the action did not reasonably advance a legitimate

12  correctional goal."  *Rhodes*, 408 F.3d at 567-68.  The adverse action must be such that

13  it "would chill or silence a person of ordinary firmness from future First Amendment

14  activities."  *Watison*, 668 F.3d at 1114 (quoting *Rhodes*, 408 F.3d at 568).

15       Based on the evidence before the court, and in viewing all facts and drawing all

16  inferences in the light most favorable to Antonetti, the court finds summary judgment

17  should be granted in favor of Defendants of Antonetti's retaliation claims.  Defendants

18  have, with authenticated evidence, shown that the record forecloses the possibility of a

19  reasonable jury finding in Antonetti's favor.  *Celotex*, 477 U.S. at 323.  Accordingly, the

20  burden shifts to Antonetti to "designate specific facts demonstrating the existence of

21  genuine issues for trial."  *In re Oracle Corp.*, 627 F.3d at 387.  Antonetti has not met his

22  burden.

23              **1.      Count VI – Antonetti's Access to Mail and Retaliation Claims**

24       Generally, prisoners have "a First Amendment right to send and receive mail."

25  *Witherow v. Paff*, 52 F.3d 264, 265 (9th Cir. 1995) (per curium).  However, a "delicate

26  balance" must be stricken between prisoners' First Amendment rights and the discretion

27  given to prison administrators to govern the order and security of the prison.  *Thornburgh*

28  *v. Abbott*, 490 U.S. 401, 407-08 (1989).  Prison officials have more leeway to regulate

incoming, rather than outgoing mail because there are greater security risks inherent in materials coming into a prison. *Id.* at 413. With respect to legal mail, prison officials are not permitted to review a prisoner's legal papers for legal sufficiency before sending them to the court. *See Ex Parte Hull*, 312 U.S. 546, 549 (1941). However, prison officials may, consistent with the First Amendment, require (1) that mail from attorneys be identified as such and (2) open such correspondence in the presence of the prisoner for visual inspection. *Wolff v. McDonnell*, 418 U.S. 539, 576-77 (1974).

Antonetti alleges Defendants interfered with his ability to send legal mail in retaliation for him filing grievances and litigation. (ECF No. 6 at 23-24). Defendants' evidence, however, shows Antonetti frequently sent out legal mail and paid for legal mail postage during the time period Defendants were allegedly retaliating against him. (*See* ECF Nos. 49-4 at 2-4 and 71-1 at 9-12, 18-19). Indeed, Antonetti's own evidence shows he had little trouble sending mail and that he had only a few slips returned for his own failure to properly weigh his mail. (ECF No. 63 at 106-118). During the timeframe Antonetti alleges Defendants were interfering with his ability to send legal mail, he sent at least nineteen (19) pieces of legal mail, including to multiple courts and to the President of the United States. (*See* ECF No. 49-4). Antonetti has provided no evidence Defendants interfered with his legal mail, or that they did so to retaliate against him for submitting grievances and litigating. Thus, the undisputed evidence shows Defendants are entitled to summary judgment as to Antonetti's interference with legal mail claims.

### 2.    Count VII – Antonetti's Due Process and Retaliation Claims

The Fourteenth Amendment of the United States Constitution guarantees all citizens, including inmates, due process of law. However, the Constitution protects only certain interests with the guarantees of due process; an inmate's right to procedural due process arises only when a constitutionally protected liberty or property interest is at stake. *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005). Such interests may arise from the Constitution itself or from state law.

Under the Due Process Clause, an inmate does not have liberty interests related to prison officials' actions that fall within "the normal limits or range of custody which the conviction has authorized the State to impose." *Sandin v. Conner,* 515 U.S. 472, 478 (1995) (citing *Meachum v. Fano,* 427 U.S. 215, 225 (1976)). The Clause contains no embedded right of an inmate to remain in a prison's general population. *Id.* at 485–86. Further, "the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." *Hewitt v. Helms,* 459 U.S. 460, 468 (1983), *overruled on other grounds by Sandin,* 515 U.S. at 472–73. "Thus, the hardship associated with administrative segregation, such as loss of recreational and rehabilitative programs or confinement to one's cell for a lengthy period of time, does not violate the due process clause because there is no liberty interest in remaining in the general population." *Anderson v. Cnty. of Kern,* 45 F.3d 1310, 1315 (9th Cir. 1995). At bottom, "[o]nly the most extreme change in conditions of confinement have been found to directly invoke the protections of the Due Process Clause...." *Chappell v. Mandeville,* 706 F.3d 1052, 1063 (9th Cir. 2013).

State law also may create liberty interests. Where segregated housing or other prison sanctions "impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life[,]" due process protections arise. *Sandin,* 515 U.S. at 483–84. What matters is not the particular label or characterization of the segregation or sanction, but instead, its underlying nature: "[n]o matter how a prisoner's segregation (or other deprivation) is labeled by the prison or characterized by the prisoner, a court must examine the substance of the alleged deprivation and determine whether it constitutes an atypical and significant hardship. . . ." *Hernandez v. Cox,* 989 F.Supp.2d 1062, 1068–69 (D. Nev. 2013).

When conducting the atypical-hardship inquiry, courts examine a "combination of conditions or factors. . . ." *Keenan v. Hall,* 83 F.3d 1083, 1089 (9th Cir.1996). These include: (1) the extent of difference between segregation and general population; (2) the duration of confinement; and (3) whether the sanction extends the length of the prisoner's

1    sentence.  *See Serrano v. Francis,* 345 F.3d 1071, 1078 (citing *Sandin,* 515 U.S. at 486–

2    87).   That a particular punishment or housing placement is more restrictive than

3    administrative segregation or general population privileges is, alone, not enough: even

4    where "the conditions in segregation are worse than those a prisoner will typically

5    encounter in prison, the Court must still consider whether the conditions are extreme

6    enough in nature and duration or whether they will necessarily affect the length of a

7    prisoner's sentence." *Hernandez,* 989 F.Supp.2d at 1069.   "Typically," as the Ninth

8    Circuit has stated, "administrative segregation in and of itself does not implicate a

9    protected liberty interest" under the *Sandin* factors.  *Serrano,* 345 F.3d at 1078.

10    The Due Process Clause does not afford prisoners a liberty interest in being free

11    from intrastate prison transfers, *Meachum*, 427 U.S. at 225, or in remaining in the general

12    prison population.  *Hewitt*, 459 U.S. at 468; *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir.

13    1997) ("administrative segregation falls within the terms of confinement ordinarily

14    contemplated by a sentence").   In *Sandin*, the Court found that a prisoner may have a

15    liberty interest in avoiding transfer to particular conditions of confinement if the transfer

16    "imposes [an] atypical and significant hardship on the inmate in relation to the ordinary

17    incidents of prison life." *Sandin*, 515 U.S. at 484.

18    Antonetti alleges Defendants placed him in ad-seg without sufficient process.

19    (ECF No. 6 at 25).  However, the undisputed evidence shows that on March 6, 2015, after

20    review, Antonetti was removed from high risk potential ("HRP") status.  (ECF No. 49-1 at

21    15).  On June 24, 2015, upon returning to ESP from court, Antonetti was housed in ad-

22    seg due to his skinhead designation and previous HRP status.  (*Id.* at 16-17).   On

23    February 4, 2016, two days after his monthly ad-seg review and the precise time period

24    his complaint alleges his ad-seg claims began accruing, Antonetti was returned to the

25    general prison population from ad-seg.  (*Id.*)  Thus, between his June 2015 and February

26    2016, Antonetti's ad-seg placement was reviewed six times.  (*Id.* at 17-18).

27    Antonetti further alleges he was later returned to ad-seg because of his race and

28    politics.  (ECF No. 6 at 25).  However, the record shows Antonetti was returned to ad-seg

1   because he was in possession of a deadly weapon.  (*See* ECF No. 49-6).  Specifically, it

2   is undisputed that on February 21, 2017, Antonetti was found in possession of a prison

3   shank after a brawl on the recreational yard.  (*See* ECF No. 49-6).  He was placed in ad-

4   seg following that incident.  (ECF No. 49-1 at 19).  On February 23, 2017, Antonetti was

5   notified of an ad-seg classification hearing regarding the incident.  (ECF No. 49-7 at 2).

6   On February 28, 2017, Antonetti's ad-seg committee declined to recommend Antonetti

7   be placed back on HRP status.  (ECF No. 49-1 at 19).  On March 2, 2017, Antonetti

8   received an ad-seg due process hearing.  (*Id.*)  At his June 23, 2017 classification hearing

9   regarding the prison shank incident, Antonetti pled guilty to a charge of possession of

10  contraband and received a post-disciplinary classification of 60 days ad-seg placement.

11  (ECF No. 49-6 at 2-5, 11).  Moreover, in addition to those multiple hearings, between the

12  late February 2017 incident and the early October 2017 filing of his complaint, Antonetti's

13  ad-seg placement was reviewed six times.  (*See* ECF No. 49-1 at 18-20).  Antonetti

14  declined to appear at his cell door for four of those six reviews.  (*See id.* at 19-20).

15      In this instance, because administrative detention for inmate weapon possession

16  falls within the terms of ordinary confinement, Antonetti does not have a liberty interest in

17  being free from ad-seg.  *See May*, 109 F.3d at 565.  Further, the record is clear Antonetti's

18  ad-seg was again reviewed frequently and he was afforded multiple due process hearings

19  but Antonetti often voluntarily failed to participate in the reviews.  (*See* ECF No. 49-1).

20  Moreover, Antonetti was released from ad-seg precisely when his complaint alleges the

21  unconstitutional ad-seg began.  (*Id.*; *see* ECF No. 6).  Consequently, Antonetti, who

22  shoulders the burden of proof on this point, has not designated facts from which a

23  reasonable jury could find he has a liberty interest.  Thus, Defendants are entitled to

24  summary judgment as to Antonetti's due process claims.

25      Because no reasonable juror could find Defendants' actions violated Antonetti's

26  First Amendment right to access the mails or his Fourteenth Amendment right to due

27  process, no reasonable juror could find that Defendants' actions were retaliation against

28  Antonetti for exercising his First Amendment rights to file grievances and litigate.  *See*

1    *Rhodes*, 408 F.3d at 567-68 (Defendants' "adverse action" must have been "because of"

2    Antonetti's protected conduct).  Moreover, the record shows Antonetti's First Amendment

3    activity was not chilled, as evidenced by his multiple grievances, the volume of legal mail

4    sent by him, and his relatively unfettered access to the courts.  *See Watison*, 668 F.3d at

5    1114 (adverse action must in fact chill plaintiff's First Amendment activity and must further

6    be action that would chill a person of ordinary firmness from future First Amendment

7    activity).

8         Antonetti has provided no evidence to show Defendants' actions chilled his

9    protected conduct for the purposes of First Amendment retaliation and thus fails to

10   demonstrate a genuine dispute of fact remains regarding any of his retaliation claims.

11   *See Rhodes*, 408 F.3d at 567-68.  Accordingly, the court recommends Defendants'

12   motion for summary judgment (ECF No. 49) be granted in favor of Defendants on Counts

13   VI and VII, Antonetti's First Amendment retaliation and access to mail and Fourteenth

14   Amendment due process claims.[8]

15   **IV.   CONCLUSION**

16        For good cause appearing and for the reasons stated above, the court

17   recommends Defendants' motion for summary judgment (ECF No. 49) be granted.

18        The parties are advised:

19        1.    Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of

20   Practice, the parties may file specific written objections to this Report and

21   Recommendation within fourteen days of receipt.  These objections should be entitled

22   "Objections to Magistrate Judge's Report and Recommendation" and should be

23   accompanied by points and authorities for consideration by the District Court.

24        2.    This Report and Recommendation is not an appealable order and any

25

26   _____

27   [8]    Where the court determines a plaintiff's allegations fail to show a statutory or
     constitutional violation, "there is no necessity for further inquiries concerning qualified
     immunity."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Here, Antonetti is unable to

28   establish a violation of his rights under the United States Constitution.  Accordingly, there
     is no need to further discuss qualified immunity.

notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

## V.   RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that Defendants' motion for summary judgment (ECF No. 49) be **GRANTED**; and

**IT IS FURTHER RECOMMENDED** that Antonetti's motion to strike portions of Defendants' reply (ECF No. 75) be **DENIED** as moot; and

**IT IS FURTHER RECOMMENDED** that Defendant John Does one (1) through fifteen (15) be **DISMISSED** from this action.

**DATED**: July 15, 2020.

_____

**UNITED STATES MAGISTRATE JUDGE**